UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| NECA-IBEW WELFARE TRUST FUND, Individually and on Behalf of All Others Similarly Situated, | Civ. Action No. |
| | CLASS ACTION |
| Plaintiff, | |
| | COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT AND THE |
| vs. | CLAYTON ANTITRUST ACT |
| ALLERGAN PLC, LANNETT COMPANY, INC., PAR PHARMACEUTICAL COMPANIES, INC., IMPAX LABORATORIES, MYLAN INC. and WEST-WARD PHARMACEUTICAL CORP., | |
| Defendants. | |
| | DEMAND FOR JURY TRIAL |

Plaintiff NECA-IBEW Welfare Trust Fund ("plaintiff"), individually and on behalf of a class of all those similarly situated, brings this action for treble damages and injunctive relief against Allergan plc (formerly Actavis plc), Lannett Company, Inc., Par Pharmaceutical Companies, Inc., Impax Laboratories, Mylan Inc. and West-Ward Pharmaceutical Corp. (collectively, "defendants") for violations of the Sherman Antitrust Act ("Sherman Act"), the Clayton Antitrust Act ("Clayton Act") and under the laws of the several states identified herein as well as the District of Columbia. Based on counsel's investigation, research and review of publicly available documents, on plaintiff's personal knowledge, and upon information and belief, plaintiff alleges as follows:

## NATURE OF THE ACTION

1.      Generic drugs are a key component of the healthcare system.  However, in recent years, the pricing on certain common drugs has skyrocketed.  And normal market forces are not to blame for these dizzying spikes.  Instead, manufacturers have improperly taken advantage of their monopoly position to hike prices far beyond what they would be in a competitive market. Doxycycline, a fairly common antibiotic used to treat a wide variety of infections, went from an average market price in October 2013 of $20 to an astonishing $1,849 in April 2014 – an increase of 8,281%.[1]  Prices for a widely prescribed medication, digoxin, have in some cases gone up more than 800% during the period 2012 to present.

2.      Several companies that make the drugs have been the focus of governmental investigations into price spikes of generic drugs.  Actavis (now Allergan), Lannett, Par, Impax and Mylan have all received subpoenas from the U.S. Department of Justice ("DOJ").[2]  All of the defendants also received a letter seeking information into doxycycline and/or digoxin pricing from Senator Bernard Sanders and Congressman Elijah E. Cummings in October 2014.  Investigations into the digoxin and doxycycline markets have been launched by the DOJ and the Connecticut

---

[1]     *See* http://www.sanders.senate.gov/download/face-sheet-on-generic-drug-price-increases?inline= file relating data provided to Congress by the Healthcare Supply Chain Association ("HSCA") on recent purchases by group purchasing organizations ("GPOs") of ten generic drugs.

[2]     At present, it is unknown whether West-Ward also received a subpoena, because its foreign parent, Hikma Pharmaceuticals PLC, does not make disclosures to the U.S. Securities and Exchange Commission ("SEC").

Attorney General's Office, with both entities subpoenaing records related to the three players in the digoxin and/or doxycycline markets.

3.     Congress too has launched an investigation into generic drug pricing.  Digoxin and doxycycline are two of the drugs Congress is focused on in the investigation.  The investigation encompasses generic drugs other than digoxin and doxycycline and plaintiff reserves the right to amend its Complaint to add more parties and/or claims as to additional drugs as more information regarding the governmental investigations is revealed.

JURISDICTION AND VENUE

4.     Plaintiff's claim for injuries sustained by reason of defendants' violations of §§1 and 3 of the Sherman Act, 15 U.S.C. §§1 and 3, are brought pursuant to §§4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26, to obtain injunctive relief and the costs of this suit, including reasonable attorneys' fees.

5.     This action is also instituted under the antitrust, consumer protection, and common laws of various states for damages and equitable relief, as described below.

6.     This Court has original federal question jurisdiction over the Sherman Act claims asserted in this Court, pursuant to 28 U.S.C. §§1331 and 1337, and §§4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26.

7.     Venue is proper in this judicial district pursuant to §§4(a) and 12 of the Clayton Act, 15 U.S.C. §§15(a) and 22, and 28 U.S.C. §1391(b), (c) and (d), because during the Class Period (October 1, 2012 through the present) one or more of the defendants resided, transacted business, were found, or had agents in this District, and a substantial part of the events giving rise to plaintiff's claims occurred, and a substantial portion of the affected interstate trade and commerce described below, has been carried out, in this District.  Venue is also proper in this District because the federal grand jury investigating the pricing of generic drugs is empanelled here and therefore it is likely that acts in furtherance of the alleged conspiracy took place here, where Lannett and Mylan are headquartered and where Impax's generics division, Global Pharmaceuticals ("Global"), is located.

8.     Venue is also proper because each of the defendants operates and transacts business within the District, each of the defendants has substantial contacts with this District, and each of the

defendants engaged in an illegal price-fixing conspiracy that was directed at, and had the intended effect of causing injury to, persons and entities residing in, located in, or doing business in the District.

## THE PARTIES

9.      Plaintiff NECA-IBEW Welfare Trust Fund ("NECA") is an employee health and welfare benefit plan with its principal place of business at 2120 Hubbard Avenue, Decatur, Illinois 62526.  Plaintiff NECA indirectly purchased, paid and/or provided reimbursement for generic digoxin and doxycycline products once each became available, other than for resale, at supracompetitive prices in multiple states across the United States during the Class Period, and was thereby injured.

10.      Defendant Allergan plc (formerly Actavis plc and referred to herein as "Actavis") is a $23 billion diversified global pharmaceutical company with global headquarters in Dublin, Ireland and U.S. administrative headquarters in Parsippany, New Jersey.  Actavis's generics portfolio features more than 1,000 generics, branded generics, established brands and over-the-counter ("OTC") products.  The company is the third largest generic drug manufacturer in the U.S. and holds a top 5 leadership position in nearly 20 international markets.  In August 2015, Actavis announced that on June 25, 2015, it had received a subpoena from the DOJ Antitrust Division seeking information relating to the marketing and pricing of certain of the company's generic products and communications with competitors about such products.  Actavis also received a letter on October 2, 2014 from Congressional investigators regarding increases for generic drugs.  Actavis was asked to provide information regarding the escalating prices it was charging for doxycycline.

11.      As one article noted, "[l]ike the other generic manufacturers who have been subpoenaed – Impax Laboratories, Lannett Company, and Par Pharmaceutical Companies, Inc. – Actavis has manufactured digoxin.  Actavis has also supplied doxycycline, which may be significant because Par had disclosed that its DOJ subpoena sought communications related to doxycycline."

12.      Defendant Lannett Company, Inc. ("Lannett"), founded in 1942, develops, manufactures, and distributes generic prescription pharmaceutical products, including doxycycline and digoxin, in tablet, capsule and oral liquid forms to customers throughout the United States.

Lannett markets its products primarily to drug wholesalers, retail drug chains, distributors and government agencies.  Lannett is based in Philadelphia.

13.     In July 2014, Lannett received interrogatories and a subpoena from the State of Connecticut Office of the Attorney General concerning its investigation into pricing of digoxin. According to the subpoena, the Connecticut Attorney General is investigating any activities that resulted in (a) fixing, maintaining or controlling prices of digoxin, or (b) allocating and dividing customers or territories relating to the sale of digoxin in violation of Connecticut antitrust law. Lannett claims that it is cooperating with the Connecticut Attorney General's investigation.

14.     Lannett also received a letter on October 2, 2014 from Congressional investigators regarding price increases for generic drugs.  Lannett was asked to provide information regarding the escalating prices it was charging for doxycycline and another drug.  On December 5, 2014, Lannett was served with a grand jury subpoena related to the continuing federal investigation of the generic pharmaceutical industry into possible violations of the Sherman Act.  The subpoena requests corporate documents from Lannett relating to corporate, financial and employee information, communications or correspondence with competitors regarding the sale of generic prescription medications, and the marketing, sale or pricing of certain products.

15.     Lannett further disclosed that on November 3, 2014, its Senior Vice President of Sales and Marketing of the company was served with a grand jury subpoena relating to a federal investigation of the generic pharmaceutical industry into possible violations of the Sherman Act. The subpoena requests corporate documents from Lannett relating to communications or correspondence with competitors regarding the sale of generic prescription medications.

16.     Then, on December 5, 2014, Lannett was served with a second grand jury subpoena related to the federal investigation of the generic pharmaceutical industry into possible violations of the Sherman Act.  The subpoena requests corporate documents from Lannett relating to corporate, financial and employee information, communications or correspondence with competitors regarding the sale of generic prescription medications, and the marketing, sale or pricing of certain products.

17.     In its most recent quarterly report, Lannett provided some further detail related to the investigation, stating:

In fiscal year 2015, the Company and certain affiliated individuals each were served with a grand jury subpoena relating to a federal investigation of the generic pharmaceutical industry into possible violations of the Sherman Act. The subpoenas request corporate documents of the Company relating to corporate, financial, and employee information, communications or correspondence with competitors regarding the sale of generic prescription medications, and the marketing, sale, or pricing of certain products, generally for the period of 2005 through the dates of the subpoenas.

18.     Defendant Par Pharmaceutical Companies, Inc. ("Par"), incorporated in 1978 as Par Pharmaceutical, Inc., is a Delaware holding company that, principally through its wholly owned operating subsidiary, Par Pharmaceutical, Inc., specializes in developing, licensing, manufacturing, marketing and distributing generic drugs in the United States. Par has about 95 products. Par's principal executive offices are located in Chestnut Ridge, New York.

19.     On December 5, 2014, Par received a subpoena from the DOJ Antitrust Division requesting documents related to communications with competitors regarding Par's authorized generic version of Covis Pharma S.a.r.l.'s ("Covis") Lanoxin® (digoxin) oral tablets and its generic doxycycline products. In 2011, the DOJ and the Kentucky Attorney General's Office settled claims with Par for several million dollars over allegations the company published grossly inflated average wholesale prices for its drugs. The average wholesale prices that Par published for its drugs were significantly inflated and bore no relationship to any prices that Par actually charged any of its customers. This created an artificial spread between the false and inflated published prices and the real prices. Some of these spreads exceeded 7,000%.[3] Par is a member of the GPhA and a Par representative has a seat on the 2016 GPhA Board of Directors.

20.     In March 2015, Par disclosed that it had received a subpoena from the Office of the Attorney General of the State of Connecticut requesting documents related to its agreement with another company to distribute an authorized generic version of digoxin. Par stated in its March 2015 Form 10-K that it had completed the response to the subpoena on October 28, 2014. Par further announced that on December 5, 2014, it received a subpoena from the DOJ Antitrust Division requesting documents related to communications with competitors regarding Par's authorized

---

[3]     On August 6, 2014, Par received a subpoena from the Office of the Attorney General of the State of Connecticut requesting documents related to the agreement with Covis to distribute an authorized generic version of Covis's Lanoxin® (digoxin) oral tablets. Par completed its response on October 28, 2014.

generic version of digoxin.  Par stated that it intends "to cooperate fully with the Department of Justice's inquiry."

21.     Par's parent company, Endo International plc ("Endo"), received a letter on October 2, 2014 from Congressional investigators asking for information regarding the escalating prices it was charging for doxycycline and two other drugs.  In a Form 10-Q for the third quarter of 2015, Endo stated:

> On December 5, 2014, the Company's subsidiary, Par, received a Subpoena to Testify Before Grand Jury from the Antitrust Division of the DOJ and issued by the U.S. District Court for the Eastern District of Pennsylvania.  The subpoena requests documents and information focused primarily on product and pricing information relating to Par's authorized generic version of Lanoxin (digoxin) oral tablets and Par's generic doxycycline products, and on communications with competitors and others regarding those products.  Par is cooperating fully with the investigation.

Endo has global headquarters in Dublin, Ireland and U.S. headquarters in Malvern, Pennsylvania.

22.     Defendant Impax Laboratories ("Impax") is a technology-based specialty pharmaceutical company.  Impax is based in Hayward, California, with facilities in New Jersey and in Philadelphia.  Impax makes 96 different generic drugs, including generic doxycycline and digoxin.  Total revenues for the second quarter 2015 for Impax increased 14% to $214.2 million, compared to $188.1 million in the prior year period.  Impax is a member of the GPhA and an Impax representative has a seat on the 2016 GPhA Board of Directors.

23.     Impax has also been the subject of the DOJ's investigation.  According to an SEC filing by Impax:

> On November 3, 2014, a sales representative of Impax Laboratories, Inc. received a subpoena from the Justice Department's Antitrust Division requesting the production of documents to and testimony before the grand jury of the Eastern District of Pennsylvania.  The request relates to any communication or correspondence with any competitor (or an employee of any competitor) in the sale of generic prescription medications.

24.     On July 14, 2014, Impax received interrogatories and a subpoena from the State of Connecticut Office of the Attorney General concerning its investigation into sales of Impax's generic product, digoxin.  According to the Connecticut Attorney General, the investigation seeks to determine whether anyone engaged in a contract, combination, or conspiracy in restraint of trade or commerce which has the effect of (i) fixing, controlling or maintaining prices, or (ii) allocating or

dividing customers or territories relating to the sale of digoxin in violation of Connecticut state antitrust law. Impax stated that it intended to cooperate with the Connecticut Attorney General in producing documents and information in response to the subpoena.

25.    Impax's 2015 Form 10-K states:

> On November 3, 2014, a sales representative of the Company received a subpoena from the Justice Department's Antitrust Division requesting the production of documents to and testimony before the grand jury of the Eastern District of Pennsylvania. The request relates to any communication or correspondence with any competitor (or an employee of any competitor) in the sale of generic prescription medications.

26.    Defendant Mylan Inc. ("Mylan") is a global generic and specialty pharmaceuticals company registered in the Netherlands and with operational headquarters in Hatfield, Hertfordshire in the United Kingdom and a U.S. base of operations in Canonsburg, Pennsylvania. Mylan received a letter on October 2, 2014 from Congressional investigators seeking information regarding the escalating prices it was charging for doxycycline and other drugs. Mylan is a member of the GPhA and a Mylan representative has a seat on the 2016 GPhA Board of Directors.

27.    On December 4, 2015, Mylan's parent, Mylan N.V., issued an SEC Form 8-K that stated "[o]n December 3, 2015, a subsidiary of Mylan N.V. . . . received a subpoena from the Antitrust Division of the U.S. Department of Justice . . . seeking information relating to the marketing, pricing and sale of our generic Doxycycline products and any communications with competitors about such products." Regulatory investigations against Mylan are not limited to doxycycline, however.

28.    In its SEC Form 10-K filed on February 16, 2016, Mylan N.V. reported that "[o]n December 21, 2015, the Company received a subpoena and interrogatories from the Connecticut Office of the Attorney General seeking information relating to the marketing, pricing and sale of certain of the Company's generic products (including Doxycycline) and communications with competitors about such products."

29.    Defendant West-Ward Pharmaceutical Corp. ("West-Ward") is one of the top generic prescription medication providers in the United States, offering both oral solid and injectable pharmaceuticals to a growing number of chain stores, wholesalers, distributors, health systems and government agencies. West-Ward is based in Eatontown, New Jersey and is the U.S. agent and

subsidiary of Hikma Pharmaceuticals PLC.  West-Ward received a letter on October 2, 2014 from Congressional investigators seeking information regarding the escalating prices it was charging for doxycycline and other drugs.  West-Ward is a member of the GPhA.

30.     All acts alleged in this Complaint to have been done by defendants were performed by their officers, directors, agents, employees, or representatives while engaged in the management, direction, control or transaction of defendants' business affairs.

**Co-Conspirators**

31.     Various other persons, firms, corporations and entities have participated as unnamed co-conspirators with defendants in the violations and conspiracy alleged herein.  In order to engage in the offenses charged and violations alleged herein, these co-conspirators have performed acts and made statements in furtherance of the antitrust violations and conspiracies alleged herein.

32.     At all relevant times, each defendant was an agent of each of the remaining defendants, and in doing the acts alleged herein, was acting within the course and scope of such agency.  Each defendant ratified and/or authorized the wrongful acts of each of the defendants. Defendants, and each of them, are individually sued as participants and as aiders and abettors in the improper acts and transactions that are the subject of this action.

**INTERSTATE TRADE AND COMMERCE**

33.     Throughout the Class Period, there was a continuous and uninterrupted flow of invoices and other documents essential to the sale and provision of doxycycline and digoxin transmitted interstate between and among offices of defendants and their customers throughout the United States, its territories and the District of Columbia.

34.     Throughout the Class Period, defendants transported substantial amounts of doxycycline and digoxin in a continuous and uninterrupted flow of interstate commerce throughout the United States, its territories and the District of Columbia.

35.     Throughout the Class Period, defendants' unlawful activities took place within and substantially affected the flow of interstate commerce and had a direct, substantial, and reasonably foreseeable effect upon commerce in the United States, its territories and the District of Columbia.

## FACTUAL ALLEGATIONS

### Generic Drugs in the United States

36.     Generic drugs are a critical aspect of the nation's healthcare system, but it wasn't always the case.  In 1984, Congress enacted the Hatch-Waxman Act.  This act simplified the regulatory process of bringing generic branded drugs to the public in several ways.  First, it eliminated the requirement that generic companies file a complex New Drug Application ("NDA") in order to obtain U.S. Food and Drug Administration ("FDA") approval.  The Hatch-Waxman Act also eliminated a requirement regarding duplicative clinical trials that had been necessary for a generic drug to gain approval.  The Hatch-Waxman Act set up a system which required, instead, that drug companies wishing to bring a generic to market file something called an Abbreviated New Drug Application ("ANDA") and allowed generic makers to rely on the safety and efficacy data provided by the original NDA holder.  The Hatch-Waxman Act also made other changes related to the time during which branded drugs would enjoy a monopoly period.

37.     Generic drugs are exact substitutes for brand name drugs which have met the same exact standards for bioequivalence and pharmaceutical equivalence set by the FDA.  Generic drug products are approved by the FDA through an ANDA and contain the same active ingredient(s), in the same dosage form, in the same strength, and are bioequivalent to the reference listed drug ("RLD") (*i.e.*, the original brand name version of the drug approved by FDA through an NDA.  Under the FDA rules, products that are classified as equivalent can be substituted with the full expectation that the substituted product will have the same clinical effect and safety profile as the prescribed product.

38.     Once a brand-name manufacturer receives NDA approval, it may list its patents in the FDA's book of Approved Drug Products with Therapeutic Equivalence Evaluations (the "Orange Book").  The FDA relies on the brand name manufacturer for information concerning the validity of the patents and applicability of the patents to the brand name drug.

39.     To obtain FDA approval of an ANDA, a generic manufacturer must certify that the generic drug will not infringe on any patents listed in the Orange Book.  An ANDA must contain one

of four certifications.  A Paragraph IV certification must state, "that such patent [for the brand name drug] is invalid or will not be infringed by the [generic manufacturer's proposed product]."

40.     As an incentive to spur generic companies to provide alternatives to branded drugs, the first generic manufacturer to file a substantially complete ANDA containing a Paragraph IV certification is allowed to market its generic drug free from competing generic manufacturers for a set period.  Often the first generic in the market comes in at a price well below the branded drug and quickly takes a large market share from the branded drug.  As more generics enter the market, the prices of the generics "continue to fall compared to the brand price, and their combined share of the market for the molecule, relative to the brand name equivalent, usually continues to grow."[4]

41.     As Professor Schondelmeyer explains, "[t]he Congressional Budget Office has credited the Hatch-Waxman Act and, importantly, the process for easy and routine A-rated generic substitution by pharmacists with providing meaningful economic competition from generic drugs, and with achieving billions of dollars of savings for drug purchasers such as consumers and employers."

42.     In his remarks to Congress, Professor Schondelmeyer noted that price trends for generic drugs were rising, and rising at a rate far outstripping the rate of general inflation – a rate of 12.9% vs. 1.5%.  He also reported that, "[t]he average annual retail price increase for brand name prescription drug products in 2013 (12.9 percent) was more than two times higher than the average annual brand name drug price increase in 2006 (5.7 percent)."  Two versions of digoxin sold by Lannett were shown to have "extremely high annual price hikes in 2013" with increases of 103% and 82%.

43.     As Professor Schondelmeyer reported, "the market for pharmaceuticals is out of balance.  Prices are not transparent.  Without actual price data, it is not possible to make true value-based decisions.  Certainly price is not the only issue in a value-based decision, but price is always

---

[4]     *See Why Are Some Generic Drugs Skyrocketing in Price?*: Hearing before the S. Comm. on Health, Education, Labor and Pensions, 113th Cong. (Nov. 20 2014) (statement of Stephen W. Schondelmeyer, BS Pharm, MA Pub Adm, Pharm.D., Ph.D., FAPhA, Professor and Head of the Department of Pharmaceutical Care and Health System, Century Mortar Club Endowed Chair in Pharmaceutical Management & Economics, University of Minnesota).

an issue in value-based decisions.  In many ways the pharmaceutical market is very asymmetric – the seller knows a lot more about the product than does the buyer."

44.    The market for generic drugs such as digoxin and doxycycline is mature.

**Doxycycline**

45.    Doxycycline is a widely prescribed antibiotic that has been on the market since 1967. It is on the World Health Organization's List of Essential Medicines, the most important medications needed in a basic health system.  It is used to treat a wide variety of ailments from skin conditions and bacterial infections to cholera and syphilis.

**Digoxin**

46.    Digoxin is derived from digitalis, an extract of the foxglove plant that was first described in medical literature by a British doctor in the 1700s, who reported its use as an herbal remedy for congestive heart failure.  The drug is considered such a standard heart medication that the World Health Organization includes it on its list of essential medicines.

47.    More than 6.5 million Americans were prescribed the drug in 2012, the most current year for which figures are available.

48.    For years the drug sold for pennies a pill, but in the past two years, prices for digoxin have skyrocketed.  According to a report in *The New York Times*, "[t]he three companies selling the drug in the United States had increased the price they charge pharmacies, at least nearly doubling it since late last year, according to EvaluatePharma, a London-based consulting firm."

49.    The price of digoxin went up more than 600% over the past two years, but there was no drug shortage, according to the FDA, that could explain the increase.  There was no new patent or formulation of the drug that could account for the rise in prices.  "What had changed most were the financial rewards of selling an ancient, lifesaving drug and company strategies intended to reap the benefits," according to *The New York Times*.

50.    According to *The New York Times*, by late 2013, a number of generic manufacturers had stopped producing and distributing the drug.  This left only two companies dominant in the market – Lannett and Impax, both relatively small players in the generic market.  Then in January of 2014 a Swiss manufacturer began selling an authorized generic, a medicine that tends to be more

expensive than a typical generic drug.  Following entry by the Swiss company, the companies began increasing the price of digoxin.  According to an analyst interviewed by *The New York Times*, "It's quite difficult to pinpoint who was the catalyst, but we are seeing a big step up."

51.     When *The New York Times* sought comment from digoxin manufacturers, only Lannett responded.  Lannett refused to discuss digoxin specifically, but stated, "On occasion and for a variety of reasons generic drug makers can and do raise prices."  Those factors, it said, included problems acquiring raw material, increased costs of complying with FDA requirements and manufacturers exiting the market.  None of those issues, however, explain the spike in digoxin prices.  And, in fact, Lannett has benefitted greatly from the spike, with its sales reported in February 2014 to be the best in the company's history, according to statements by Lannett President and Chief Executive Officer ("CEO") Arthur P. Bedrosian ("Bedrosian") to analysts.  Lannett claims to have engaged outside counsel to conduct a review of its pricing practices, but it has not provided the complete results of that review. Instead, Lannett has stated that the results "confirm our belief that the company has and continues to adhere to applicable laws and regulations with regard to pricing of digoxin."  Lannett declined, however, to disclose what it actually charges for digoxin.

52.     As analysts have noted: "A plausible explanation [for price increases of generic drugs, including generic digoxin] is that generic manufacturers, having fallen to near historic low levels of financial performance are cooperating to raise the prices of products whose characteristics – low sales due to either very low prices or very low volumes – accommodate price inflation."

53.     Generic digoxin pricing was stable until approximately mid-October 2013.  In materials submitted by Professor Schondelmeyer, Director of the PRIME Institute at the College of Pharmacy for the University of Minnesota, as part of his testimony before the Senate Committee, the sudden spike in digoxin pricing is clear and stunning.



Figure 12. Digoxin 0.25 mg Tablet (Lannett) Price per Day of Therapy:
(January 1, 2005 to December 31, 2013)

54.     These price increases were caused by sudden and abrupt pricing changes made by Lannett, West-Ward, and Impax that were followed by Par and Mylan when they entered the market in 2014 and 2015, respectively.  In or about November and December of 2013, pricing for .125 mg and .250 mg tablets of digoxin increased more than 750%, *from $.11 and $.12 per tablet to $.91 and $1.01 per tablet*.  Between December 2013 and January 2014, the prices of digoxin jumped again to $1.08 and $1.11 per tablet.  Medication that once cost 11 or 12 cents per pill in early November 2013 *cost nearly ten times more* by early January 2014.

55.     Data from the National Average Drug Acquisition Cost ("NADAC") on generic digoxin show price increases that led to identical prices for Lannett's, West-Ward's and Impax's generic digoxin products.  The same was true of Par's pricing of generic digoxin in the United States beginning in early 2014 and of Mylan's pricing of generic digoxin when it entered the market in 2015.

56.     There were no reasonable justifications for this abrupt shift in pricing conduct. The presence or absence of competitors in the marketplace also does not explain the price of generic digoxin. Another chart with data from IMS Health Inc. shows the massive spike in prices:





57.     Following the dramatic price increases in the fall of 2013, Par entered the market in early 2014 and Mylan entered the market in 2015.  Prices did not fall despite the addition of new competitors.  Pricing has remained inflated to this day.

58.     One reason prices might rise could be a supply disruption or shortage, but there was no such disruption or shortage related to digoxin in the fall of 2013.  As stated on the website of the Generics and Biosimilars Initiative on August 29, 2014, "[a]t the time of the price increases, the U.S. Food and Drug Administration had reported no drug shortages, there was no new patent or new formulation and digoxin is not difficult to make.  The companies have not yet provided an explanation for the price rise."  And while executives from Lannett, Impax and Par were invited to appear before the Senate Committee to explain the pricing of their generics, they all refused to appear.

59.     Independent pharmacist Robert Frankil provided damning testimony before the Senate Committee:

> A recent example from my own experience is the price of Digoxin – a drug used to treat heart failure.  The price of this medication jumped from about $15 for 90 days' supply, to about $120 for 90 days' supply.  That's an increase of 800%.  One of my patients had to pay for this drug when he was in the Medicare Part D coverage gap in 2014.  Last year, when in the coverage gap he paid the old price.  This year he paid the new price.  Needless to say, the patient was astounded, and thought I was overcharging him.  The patient called all around to try to get the medicine at the old, lower price, but to no avail.  This caused him lots of stress and time, and caused us lots of stress and time in explaining the situation, reversing, and rebilling the claim.  This example is typical of how these price spikes put consumers and pharmacists in a bad position, often grasping at straws for explanations.  And all the while, everyone pays more, including the patient, the pharmacy, and the insurer (often the federal government).[5]

60.     In February 2014, during a call with analysts regarding fourth quarter results for 2013, the former President of Impax, Carole Ben-Maimon, was asked about the "competitive dynamics" related to digoxin pricing with the entry by Par into the market and whether pricing was "rational."  Dr. Ben-Maimon, who announced her resignation in October 2014, citing personal and family reasons, refused to provide specifics related to digoxin pricing, stating, "I don't want to really specifically talk about pricing on digoxin."  She further noted that "the market has been pretty stable

---

[5]     *Why Are Some Generic Drugs Skyrocketing in Price?: Hearing before the S. Comm. on Health, Education, Labor and Pensions*, 113th Cong. (Nov. 20, 2014) (statement of Rob Frankil, Independent Pharmacist and Member of the National Community Pharmacists Association (NCPA)).

with [Lannett] and us . . . .  We're pretty comfortable that what we have done is rational, and will result in ongoing profitability for that product."

61.     The markets for generic digoxin and generic doxycycline are oligopolies.  By October 2013, the generic digoxin market was essentially a duopoly controlled by Lannett and Impax.[6] Mylan and Par entered that market in 2014 and 2015, respectively.  Par, West-Ward, Mylan, Actavis and Lannett are also major players in the market for generic doxycycline.

62.     For generic doxycycline, the pattern of huge price increases started in the fall of 2012, a year earlier than for generic digoxin.

63.     Professor Schondelmeyer, in his testimony before the Senate Committee, presented the following chart showing the sudden increase in West-Ward's pricing for generic doxycycline, the average wholesale price of which went from under $2.50 for a day of therapy for 100 mg capsules of doxycycline hyclate to over $11 by January 2013:



64.     The doxycycline spikes were reported on in March 2013:

> Doctors use doxycycline to treat a wide range of issues, including everything from acne to Lyme disease, anthrax exposure and even heartworm in our pets.

---

[6]     Defendant West-Ward, a subsidiary of Hikma Pharmaceuticals PLC, is also a competitor, but it suspended certain operations in November 2012 after an investigation by the FDA found problems at its manufacturing facility.  It resumed participation in the generic digoxin market in July 2013.

However, the once cheap and effective drug has now dramatically gone up in price, and that has health professionals concerned.

Hospitals like Vanderbilt University Medical Center keep doxycycline in stock, but some folks worry the cure for their ailment could now be financially out of reach.

"It's a change that occurred overnight," said Vanderbilt pharmacy manager Michael O'Neil.

Not long ago, the pharmacy at Vanderbilt's hospital could purchase a 50-count bottle of 100 mg doxycycline tablets for $10, but now the same bottle costs a staggering $250.

"That's concerning to us, both as citizens and practitioners, when you see a huge increase like this in a price of a drug," O'Neil said.

Vanderbilt keeps thousands of doxycycline pills on hand in the event of a bioterrorist attack, like anthrax, and O'Neil said replacing expired pills is prohibitive. . . .

But it's the most vulnerable who are in the most jeopardy.  For a pet, a heartworm diagnosis can be a death sentence without doxycycline.

Veterinarian Dr. Joshua Vaughn of the Columbia Hospital for Animals is already seeing the tragic results.

"We had one patient who we diagnosed with heartworm.  We recommended heartworm treatment, but when they saw the total dollar amount, they elected not to treat the dog at all," Vaughn said.

**Investigations into Defendants' Business
Activities by Government Agencies**

65.    The spikes in prices of doxycycline and digoxin have resulted in significant government investigations, the results of which are at this time unknown.

66.    According to an SEC filing by Impax, "[o]n November 3, 2014, a sales representative of Impax Laboratories, Inc. received a subpoena from the Justice Department's Antitrust Division requesting the production of documents to and testimony before the grand jury of the Eastern District of Pennsylvania.  The request relates to any communication or correspondence with any competitor (or an employee of any competitor) in the sale of generic prescription medications."

67.    Subsequently, in an SEC Form 10-Q filed on May 11, 2015, Par indicated that the "[o]n December 5, 2014, we received a subpoena from the Antitrust Division of the DOJ requesting documents related to communications with competitors regarding our authorized generic version of

Covis's Lanoxin® (digoxin) oral tablets and our generic doxycycline products." This assertion was repeated in Impax's Form 10-Q filed on August 6, 2015.

68.    Lannett reported that on November 3, 2014, the Senior Vice President of Sales and Marketing of the company was served with a grand jury subpoena relating to a federal investigation of the generic pharmaceutical industry into possible violations of the Sherman Act. The subpoena requests corporate documents of Lannett relating to communications or correspondence with competitors regarding the sale of generic prescription medications, but is not specifically directed to any particular product and is not limited to any particular time period.

69.    In February 2014 Lannett touted its record sales: "For the fiscal 2014 second quarter, we recorded the highest net sales, gross margin and net income in our company's history." Lannett noted that the record results were "driven by price increases, strong sales of existing products and favorable product mix."

70.    In a February 6, 2014 earnings conference call, Lannett further recognized the "key products that are driving [gross margin] from a price-increase perspective . . . from a magnitude perspective, are the levothyroxine sodium product, and also digoxin."

71.    During the same earnings conference call, the President and CEO of Lannett was asked whether and to what extent the entry into the market by Par of an authorized generic version of digoxin would impact sales. CEO Bedrosian stated that Lannett viewed Par as "one of our rational competitors in the marketplace." This, he said meant that while Par would "capture a certain market share," adding "movement behind the brand" "actually expands the generic market as well."

72.    When pressed by an analyst regarding what he meant by calling Par a "rational competitor," Bedrosian noted "we're not troubled by their pricing in the marketplace, not at all." When further asked whether the pricing was in line with Lannett's and whether Par "followed suit in terms of [Lannett's] price increase," Bedrosian claimed, "It's hard to say what's in line. It's not doing us any harm, but I don't know how you would describe what's in line. I don't talk to them, so I don't really know how they determine their pricing." He further noted that Par's "prices that they're quoting are not doing us any harm at all."

73.     According to Lannett's Annual Report for 2014, its sales of digoxin for the year ending on June 30, 2014 was $54 million.

74.     On February 4, 2015, in another quarterly earnings call, Bedrosian confirmed there would be a moratorium on price competition. He stated: "I think you're going to find more capital pricing [in the generic marketplace], more – I'll say less competition, in a sense. You won't have price wars." In his view, "I just don't see the prices eroding like they did in the past."

75.     According to Lannett, irrational competitors were those who competed on price in order to obtain market share. The statement is a signal that Lannett understood that Impax, Par and Mylan, among others, were no longer interested in competing on price, an understanding that could only exist if the three firms had reached a consensus on how to price. Bedrosian's statements demonstrate the parties had agreed. Bedrosian was also certain of reaching a similar consensus with Mylan.

76.     Impax's CEO, Frederick Wilkinson, made similar statements during the company's third quarter 2014 earnings call: "[W]e've done what most of the other generic houses have done. We look at opportunities. We look at how competition shifts. We look at where there may be some market movement that will allow us to take advantages on price increases and we've implemented those."

77.     This meeting of the minds among the competing sellers of generic digoxin and generic doxycycline resulted in enormous profits. Bedrosian noted in the February 4, 2015 earnings call that Lannett "recorded the highest net sales and net income in our company's history." Gross profits in the first six months of the 2015 fiscal year were $158.8 million or 76% of net sales, compared with $42.3 million or 37% of net sales during the previous fiscal year. Generic digoxin pricing played a big role in its success. A 2015 Lannett presentation noted that generic digoxin accounted for 23% of the company's revenues. As noted in the same presentation, Lannett is highly dependent on price increases for revenue growth.

78.     According to its 2015 SEC Form 10-K filed on February 26, 2015, Impax had $596 million in total revenues in the 2014 calendar year, compared to $511 million in 2013 – a 17% increase. The primary factor in this growth was "higher sales of our Digoxin."

79.     That the defendants have received subpoenas from a federal grand jury is significant, as is reflected in Chapter III of the 2015 edition of the DOJ's *Antitrust Division Manual*.  Section F.1 of that chapter notes that "staff should consider carefully the likelihood that, if a grand jury investigation developed evidence confirming the alleged anticompetitive conduct, the Division would proceed with a criminal prosecution." *Id*. at III-82.  The staff request "should forward the grand jury request memorandum to the field office chief for review.  If approved by the chief, the grand jury request should be emailed to the ATR-CRIM-ENF [Antitrust Criminal Enforcement Division]." *Id*.  "The DAAG [Deputy Assistant Attorney General] for Operations, the Criminal DAAG, and the Director of Criminal Enforcement will make a recommendation to the Assistant Attorney General.  If approved by the Assistant Attorney General, letters of authority are issued for all attorneys who will participate in the grand jury investigation." *Id*. at III-83.  "The investigation should be conducted by a grand jury in a judicial district where venue lies for the offense, such as a district from or to which price-fixed sales were made or where conspiratorial communications occurred." *Id*.  Thus, the fact that Lannett, Impax, Actavis, Mylan and Par or their employees received federal grand jury subpoenas is a strong indicator that antitrust offenses have occurred.

80.     As Professor Schondelmeyer reported, "the market for pharmaceuticals is out of balance.  Prices are not transparent.  Without actual price data, it is not possible to make true value-based decisions.  Certainly price is not the only issue in a value-based decision, but price is always an issue in value-based decisions.  In many ways the pharmaceutical market is very asymmetric – the seller knows a lot more about the product than does the buyer."

81.     In addition to the subpoenas and interrogatories issued by the DOJ and the Connecticut Attorney General's Office, Congress has taken an interest in the spiraling costs of generic drugs, holding hearings and calling for an investigation.  In October 2014 Senator Bernie Sanders (I-Vt.) and U.S. Representative Elijah E. Cummings (D-Md.) launched an investigation into soaring generic drug prices.

82.     "We are conducting an investigation into the recent staggering price increases for generic drugs used to treat everything from common medical conditions to life-threatening illnesses," Sanders, chairman of a Senate healthcare subcommittee, and Cummings, ranking member

of the House Oversight Committee, wrote in letters to 14 pharmaceutical companies. Cummings and Sanders cited a survey that found pharmacists across the country "'have seen huge upswings in generic drug prices that are hurting patients'" and having a "'"very significant'"'" impact on pharmacists' ability to continue serving patients. The study for the National Community Pharmacists Association also found some patients refused to fill needed prescriptions because of rising prices.

83.     "It is unacceptable that Americans pay, by far, the highest prices in the world for prescription drugs. Generic drugs were meant to help make medications affordable for the millions of Americans who rely on prescriptions to manage their health needs. We've got to get to the bottom of these enormous price increases," Sanders said.

84.     "When you see how much the prices of these drugs have increased just over the past year, it's staggering, and we want to know why," said Cummings. "I am very pleased that Chairman Sanders has joined me in this bicameral investigation because in some cases these outrageous price hikes are preventing patients from getting the drugs they need."

85.     In letters to the heads of a number of companies that make doxycycline and digoxin, Sanders and Cummings wrote and requested information about the escalating prices. According to the letters, which cited information provided by the HSCA, the average price charged for doxycycline increased by *as much as 8,281%* over the span of less than a year.

86.     The letters sought documents and information from 2012 to the present, including total gross revenues from the companies' sales of the suspect drugs; the dates, quantities, purchasers and prices paid for all sales of the drugs; total expenses relating to the sales of the drugs, as well as the specific amounts for manufacturing, marketing and advertising, and purchases of active pharmaceutical ingredients, if applicable; sales contracts or purchase agreements for active pharmaceutical ingredients for the drugs, including any agreements relating to exclusivity, if applicable; a description and valuation of the specific financial and non-financial factors that contributed to the various companies' decisions to increase the prices of the drugs; any cost estimates, profit projections, or other analyses relating to the companies' current and future sales of the drugs; prices of the drugs in all foreign countries or markets, including price information for the

countries paying the highest and lowest prices; and the identity of official(s) responsible at each company for setting the prices of these drugs over the above time period. The letter sought responses by October 23, 2014. To date it is unknown whether the companies responded, although counsel for plaintiff sent a request for any and all documents to Senator Sanders's office.

87.     Following on the heels of the congressional investigation, the Office of Inspector General ("OIG") launched its own generic pricing investigation. The OIG will update its review of generic drug price increases under the Medicaid drug rebate program by examining the quarterly average manufacturer prices from 2005 through 2014 to determine the extent to which the average manufacturer prices exceeded the specified inflation factor. Brand name manufacturers are compelled to pay additional rebates when their drugs' average manufacturer prices increase by more than a specified inflation factor, but there is no such requirement for generic manufacturers. As part of its study, the OIG will determine the amount of additional rebates Medicaid could have recouped if the statutory inflation factor also applied to generics. The timetable for the results of the study has not been released.

**Trade Associations Facilitated Defendants' Scheme**

88.     The conspiracy related to doxycycline and digoxin may have been accomplished in part through the use of trade organizations. According to an intelligence report from Policy and Regulatory Report ("PaRR"), a source that was given some inside information by a prosecutor involved in the probe into the companies, said the DOJ is looking closely "'at trade associations as part of their investigation as having been one potential avenue for facilitating the collusion between salespeople at different generic producers.'" The investigative subpoenas that have been issued, with a focus on sales personnel, indicate that the collusion may have had its roots at trade associations.

89.     The Generic Pharmaceutical Association (GPhA) is the nation's leading trade association for manufacturers and distributors of generic prescription drugs, manufacturers of bulk active pharmaceutical chemicals, and suppliers of other goods and services to the generic industry. GPhA was founded in 2000, following the merger of three industry trade organizations: the Generic Pharmaceutical Industry Association, the National Association of Pharmaceutical Manufacturers and

the National Pharmaceutical Alliance.  The three groups represented similar members, with the former two placing a greater emphasis on scientific issues and the latter focusing on sales and marketing issues.  As GPhA, the industry now speaks with a stronger, unified voice before federal and state lawmakers, regulatory policymakers and international agencies.

90.    Several defendants have representatives on the GPhA 2016 Board of Directors, including Impax, Mylan and Par.  Other defendants are members of the organization.  According to the GPhA website, "GPhA member companies supply approximately 90 percent of the generic prescription drugs dispensed in the U.S. each year.  The membership includes the world's largest generic finished dose manufacturers and active pharmaceutical ingredient suppliers."

### THE GENERIC DIGOXIN AND DOXYCYCLINE MARKETS ARE SUSCEPTIBLE TO ANTICOMPETITIVE CONDUCT

91.    Publicly available data on the generic digoxin and doxycycline markets in the United States demonstrates that it is susceptible to cartelization by the defendants.  Factors that make a market susceptible to collusion include: (1) a high degree of industry concentration; (2) significant barriers to entry; (3) inelastic demand; (4) the lack of available substitutes for the goods involved; (5) a standardized product with a high degree of interchangeability between the goods of cartel participants; (6) absence of a competitive fringe of sellers; and (7) intercompetitor contacts and communication.  Each of those factors is present here.

**Market Concentration**

92.    A high degree of concentration facilitates the operation of a cartel because it makes it easier to coordinate behavior among co-conspirators.  In the United States generic digoxin and generic doxycycline markets, the number of competitors has dwindled, at times with only two participants, creating ideal cartel conditions.  The firms that currently control most of the market are the defendants.  Statements by Lannett further demonstrate Impax, Par and Mylan are its only serious competitors in that market.

**Barriers to Entry**

93.    Supracompetitive pricing in a market normally attracts additional competitors who want to avail themselves of the high levels of profitability that are available.  However, the presence

of significant barriers to entry makes this more difficult and helps to facilitate the operation of a cartel.

94.     Here, there are significant capital, regulatory, and intellectual property barriers to entry in the generic digoxin and doxycycline markets.

95.     Par's own 2015 Form 10-K (cited above) states that its business is to develop and commercialize "generic drugs with limited competition, high barriers to entry and longer life cycles."

96.     Costs of manufacture, coupled with regulatory oversight, represent a substantial barrier to entry in both the generic digoxin and doxycycline markets.  For example, West-Ward had to temporarily shut down its New Jersey production facility for digoxin and spend millions of dollars to fix the problem.  Likewise, Impax's 2015 Form 10-K (cited above) referenced FDA warning letters it received with respect to its manufacturing facilities in Hayward, California and Taiwan.

97.     Intellectual property costs can also be substantial, particularly in the lucrative generics market.

98.     With respect to generic digoxin, while some market entry has occurred on a limited basis, (Par and Mylan's later entry), that entry has not curbed price-fixing in the industry.  Indeed, as noted above, Bedrosian regards both companies as "rational" competitors more interested in higher profits on fewer sales than winning market share through price competition.

**Demand Inelasticity**

99.     Elasticity of demand is defined as the relationship between a change in the quantity demanded for a product and a change in price of the same product.

100.     Generic digoxin is an important and medically necessary drug for millions of people. Patients consider it a medical necessity that must be purchased at whatever cost the defendants offer it for sale.  Doxycycline too is considered a critical drug for those that require it.

101.     Generic digoxin and generic doxycycline are ideal products to price-fix as price increases will result in more revenue, rather than less.

**Lack of Substitutes**

102.    While there are other heart disease drugs on the market, digoxin is the only effective medicine for certain patients and is considered by the World Health Organization as an "essential medicine." The same is true for doxycycline, which is specifically prescribed for a variety of health conditions.

**High Degree of Interchangeability**

103.    A commodity-like product is one that is standardized across suppliers and allows for a high degree of substitutability among different suppliers in the market. When products offered by different suppliers are viewed as interchangeable by purchasers, it is easier for the suppliers to agree on prices for the good in question and it is easier to monitor these prices effectively. Generic drugs are by definition interchangeable. The generic digoxin and/or generic doxycycline made by the defendant manufacturers are each chemical compounds composed of the same raw materials.

**Absence of a Competitive of Sellers**

104.    Companies that are not part of the conspiracy can erode conspirators' market shares by offering products at lower, more competitive prices. This reduces revenue and makes sustaining a conspiracy more difficult. In the market for generic digoxin, there is no realistic threat that a fringe of competitive sellers will take market share from defendants. The defendants in the respective markets for generic digoxin and generic doxycycline have oligopolistic power over those markets, which facilitates their ability to raise prices without losing market share to non-conspirators.

**Contacts and Communication Opportunities**

105.    In order to be successful, collusive agreements require a level of trust among the conspirators. Collaboration fostered through industry associations facilitate relationships between individuals who would otherwise be predisposed to compete vigorously with each other. Here, the defendants are members of or participants in the GPhA, which describes itself on its website as "the nation's leading trade association for manufacturers and distributors of generic prescription drugs, manufacturers of bulk active pharmaceutical chemicals, and suppliers of other goods and services to the generic industry." Thus, representatives of the defendants have opportunities to meet and conspire at functions of this group, as well as at industry healthcare meetings. In addition, as noted

above, Lannett's CEO Bederosian has made positive assertions about how Lannett and its competitors view the competitive landscape for generic drugs, and that none of them will compete on price for the foreseeable future. Such statements indicate there have been contacts and communications among supposed competitors. The grand jury subpoenas lend further support to the conclusion that communications between competitors occurred with respect to the pricing of generic digoxin and/or doxycycline.

### DEFENDANTS' ANTITRUST VIOLATIONS

106. During the Class Period, defendants engaged in a continuing agreement, understanding, and conspiracy in restraint of trade to artificially raise, fix, maintain or stabilize the prices of generic drugs, including digoxin and/or doxycycline in the United States and its territories.

107. In formulating and effectuating the contract, combination or conspiracy, the defendants identified above and their co-conspirators engaged in anticompetitive activities, the purpose and effect of which were to artificially raise, fix, maintain, and/or stabilize the price of generic digoxin and/or generic doxycycline sold in the United States and its territories. These activities included the following:

(a)     Defendants participated in meetings and/or conversations to discuss the price of generic digoxin and/or generic doxycycline in the United States;

(b)     Defendants agreed during those meetings and conversations to charge prices at specified levels and otherwise to increase and/or maintain prices of generic digoxin and/or generic doxycycline sold in the United States;

(c)     Defendants agreed during those meetings and conversations to fix the prices of generic digoxin and/or generic doxycycline; and

(d)     Defendants issued price announcements and price quotations in accordance with their agreements.

108. Defendants and their co-conspirators engaged in the activities described above for the purpose of effectuating the unlawful agreements described in this Complaint.

109. During and throughout the period of the conspiracy alleged in this Complaint, plaintiff and members of the Class (defined herein) purchased generic digoxin and/or generic

doxycycline from defendants (or their subsidiaries or controlled affiliates) or their co-conspirators at inflated and supracompetitive prices.

110. Defendants' contract, combination, or conspiracy constitutes an unreasonable restraint of interstate trade and commerce in violation of §1 of the Sherman Act (15 U.S.C. §1) and §3 of the Sherman Act (15 U.S.C. §3) and the laws of various states.

111. As a result of defendants' unlawful conduct, plaintiff and the other members of the Class have been injured in their business and property in that they have paid more for generic digoxin and/or generic doxycycline than they would have paid in a competitive market.

112. The unlawful contract, combination or conspiracy has had the following effects, among others:

(a) Price competition in the market for generic digoxin and/or generic doxycycline has been artificially restrained;

(b) Prices for generic digoxin and/or generic doxycycline sold by defendants have been raised, fixed, maintained, or stabilized at artificially high and non-competitive levels; and

(c) Purchasers of generic digoxin and/or generic doxycycline from defendants have been deprived of the benefit of free and open competition in the market for generic digoxin and/or generic doxycycline.

**CLASS ACTION ALLEGATIONS**

113. Plaintiff brings this action as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure.  Plaintiff seeks to certify two classes, the first under federal antitrust laws and the second under the various state laws detailed in Counts III, IV and V.

114. The Nationwide Class is brought under Fed. R. Civ. P. 23(a) and (b)(2) and seeks equitable and injunctive relief.  The Nationwide Class is defined as follows:

> All persons and entities in the United States and its territories who purchased, paid and/or provided reimbursement for some or all of the purchase price of defendants' generic digoxin or generic doxycycline products from October 1, 2012 through the present.  This class excludes: (a) defendants, their officers, directors, management, employees, subsidiaries and affiliates; (b) all federal and state governmental entities except for cities, towns or municipalities with self-funded prescription drug plans; (c) all persons or entities who purchased defendants' generic digoxin or doxycycline products for purposes of resale or directly from defendants; (d) fully insured health plans (*i.e.*, health plans that purchased insurance covering 100% of their reimbursement obligation to members); (e) any "flat co-pay" consumers whose

purchases of defendants' generic digoxin or doxycycline products were paid in part by a third-party payor and whose co-payment was the same regardless of the retail purchase price; and (f) any judges or justices involved in this action and any members of their immediate families.

115.   Plaintiff also brings this action as a class action under Fed. R. Civ. P. 23(a) and (b)(3) seeking damages under the state antitrust, common law and consumer protection laws of the states listed below (the Indirect Purchaser States).  This class is the Damages Class and is defined as follows:

> All persons and entities in the Indirect Purchaser States who purchased, paid and/or provided reimbursement for some or all of the purchase price of defendants' generic digoxin or generic doxycycline products from October 1, 2012 through the present. This class excludes: (a) defendants, their officers, directors, management, employees, subsidiaries and affiliates; (b) all federal and state governmental entities except for cities, towns or municipalities with self-funded prescription drug plans; (c) all persons or entities who purchased defendants' generic digoxin or doxycycline products for purposes of resale or directly from defendants; (d) fully insured health plans (*i.e.*, health plans that purchased insurance covering 100% of their reimbursement obligation to members); (e) any "flat co-pay" consumers whose purchases of defendants' generic digoxin or doxycycline products were paid in part by a third-party payor and whose co-payment was the same regardless of the retail purchase price; and (f) any judges or justices involved in this action and any members of their immediate families.

116.   The Nationwide Class and the Damages Class are referred to collectively herein as the "Class."

117.   Due to the nature of the trade or the commerce involved, plaintiff does not know the exact number of Class members involved; however, plaintiff believes that Class members are sufficiently numerous and geographically dispersed throughout the United States so that joinder of all Class members is impracticable.

118.   Plaintiff is a member of the Class, plaintiff's claims are typical of the claims of the Class members, and plaintiff will fairly and adequately protect the interests of the Class.  Plaintiff and Class members purchased generic doxycycline and/or generic digoxin from defendants at artificially maintained, supracompetitive prices established by the actions of defendants in connection with the restraint of trade alleged herein.  Plaintiff's interests are coincident with and not antagonistic to those of the other members of the Class.

119.   Plaintiff is represented by counsel who are competent and experienced in the prosecution of complex class action litigation.

120.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for defendants.

121.     The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability, damages and restitution.  Among the questions of law and fact common to the Class are:

(a)     Whether defendants and their co-conspirators colluded to fix, raise, maintain, and/or stabilize the price of generic doxycycline and/or generic digoxin in the United States;

(b)     Whether defendants violated §1 of the Sherman Act;

(c)     Whether defendants violated §3 of the Sherman Act;

(d)     Whether defendants violated the laws of the Indirect Purchaser States;

(e)     The duration of the conspiracy alleged in this Complaint;

(f)     The nature and character of the acts performed by defendants in furtherance of the conspiracy;

(g)     Whether, and to what extent, the conduct of defendants caused injury to plaintiff and members of the Class, and, if so, the appropriate measure of damages; and

(h)     Whether plaintiff and members of the Class are entitled to injunctive relief to prevent the continuation or furtherance of the violation of §1 of the Sherman Act.

122.     A class action is superior to other methods for the fair and efficient adjudication of this controversy.  Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender.  Class treatment will also permit the adjudication of claims by many Class members who could not individually afford to litigate an antitrust claim such as is asserted in this Complaint.  This class action likely presents no difficulties in management that would preclude its maintenance as a class action.  Finally, the Class is readily ascertainable.

## COUNT I

### Violation of §1 of the Sherman Act
### on Behalf of Plaintiff and the Nationwide Class

123.    Plaintiff realleges and incorporates by reference all the above allegations as if fully set forth herein.

124.    During Class Period, defendants engaged in a continuing combination or conspiracy to unreasonably restrain trade and commerce in violation of §1 of the Sherman Act, 15 U.S.C. §1, by artificially reducing or eliminating competition in the market for generic doxycycline and/or generic digoxin and engaging in a conspiracy to artificially fix, raise, maintain, and/or stabilize the prices for generic doxycycline and/or generic digoxin in the United States.

125.    In particular, defendants have agreed, combined, and conspired to raise, fix, maintain, or stabilize the prices of generic doxycycline and/or generic digoxin in the United States.

126.    In formulating and effectuating their contract, combination or conspiracy, defendants and their co-conspirators engaged in anticompetitive activities, the purpose and effect of which were to artificially fix, raise, maintain, and/or stabilize the prices of generic doxycycline and/or generic digoxin in the United States.

127.    Defendants' combination or conspiracy consisted of a continuing agreement, understanding and concerted action among defendants.

128.    Defendants' conspiracy had the effect of artificially inflating the price of generic doxycycline and/or generic digoxin in the United States.

129.    As a direct and proximate result of defendants' unlawful conduct, plaintiff and the other members of the Nationwide Class paid more for generic doxycycline and/or generic digoxin than they otherwise would have paid in the absence of defendants' unlawful conduct.

130.    By reason of defendants' unlawful conduct, plaintiff and members of the Nationwide Class have been deprived of free and open competition in the purchase of generic doxycycline and/or generic digoxin.

131.    As a direct and proximate result of defendants' conduct, plaintiff and members of the Nationwide Class have been injured and damaged in their business and property in an amount to be determined.

## COUNT II

### Violation of §3 of the Sherman Act
### on Behalf of Plaintiff and the Nationwide Class

132.    Plaintiff realleges and incorporates by reference all the above allegations as if fully set forth herein.

133.    During Class Period, defendants engaged in a continuing combination or conspiracy to unreasonably restrain trade and commerce in violation of §3 of the Sherman Act, 15 U.S.C. §3, by artificially reducing or eliminating competition in the market for generic doxycycline and/or generic digoxin and engaging in a conspiracy to artificially fix, raise, maintain, and/or stabilize the prices for generic doxycycline and/or generic digoxin in any territory of the United States or in the District of Columbia.

134.    In particular, defendants have agreed, combined, and conspired to raise, fix, maintain, or stabilize the prices of generic doxycycline and/or generic digoxin in any territory of the United States or in the District of Columbia.

135.    In formulating and effectuating their contract, combination or conspiracy, defendants and their co-conspirators engaged in anticompetitive activities, the purpose and effect of which were to artificially fix, raise, maintain and/or stabilize the prices of generic doxycycline and/or generic digoxin in any territory of the United States or in the District of Columbia.

136.    Defendants' combination or conspiracy consisted of a continuing agreement, understanding and concerted action among defendants.

137.    Defendants' conspiracy had the effect of artificially inflating the price of generic doxycycline and/or generic digoxin in any territory of the United States or in the District of Columbia.

138.    As a direct and proximate result of defendants' unlawful conduct, plaintiff and the other members of the Nationwide Class paid more for generic doxycycline and/or generic digoxin than they otherwise would have paid in the absence of defendants' unlawful conduct.

139.    By reason of defendants' unlawful conduct, plaintiff and members of the Nationwide Class have been deprived of free and open competition in the purchase of generic doxycycline and/or generic digoxin.

140.    As a direct and proximate result of defendants' conduct, plaintiff and members of the Nationwide Class have been injured and damaged in their business and property in an amount to be determined.

## COUNT III

### Violation of State Antitrust Statutes
### on Behalf of Plaintiff and the Damages Class

141.    Plaintiff repeats the allegations set forth above as if fully set forth herein.

142.    During the Class Period, defendants and their co-conspirators engaged in a continuing contract, combination or conspiracy with respect to the sale of generic digoxin and/or generic doxycycline in unreasonable restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below.

143.    The contract, combination, or conspiracy consisted of an agreement among defendants and their co-conspirators to fix, raise, inflate, stabilize, and/or maintain at artificially supracompetitive prices for generic digoxin and/or generic doxycycline and to allocate customers for generic digoxin and/or generic doxycycline in the United States and its territories.

144.    In formulating and effectuating this conspiracy, defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including: (a) participating in meetings and conversations among themselves in the United States during which they agreed to price generic digoxin and/or generic doxycycline at certain levels, and otherwise to fix, increase, inflate, maintain, or stabilize effective prices paid by plaintiff and members of the Damages Class with respect to generic digoxin and/or generic doxycycline provided in the United States; and (b) participating in meetings and trade association conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

145.    Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, increase, maintain, or stabilize prices of generic digoxin and/or generic doxycycline.

146.    Defendants' anticompetitive acts described above were knowing, willful and constitute violations or flagrant violations of the following state antitrust statutes.

147.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Ariz. Rev. Stat. §44-1401 *et seq*. Defendants' combinations or conspiracies had the following effects: (1) price competition for generic digoxin and/or generic doxycycline was restrained, suppressed and eliminated throughout Arizona; (2) generic digoxin and/or generic doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout Arizona; (3) plaintiff and members of the Damages Class were deprived of free and open competition; and (4) plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic digoxin and/or generic doxycycline. During the Class Period, defendants' illegal conduct substantially affected Arizona commerce. As a direct and proximate result of defendants' unlawful conduct, plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, defendants entered into agreements in restraint of trade in violation of Ariz. Rev. Stat. §44-1401 *et seq*. Accordingly, plaintiff and members of the Damages Class seek all forms of relief available under Ariz. Rev. Stat. §44-1401 *et seq*.

148.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Cal. Bus. & Prof. Code §16700 *et seq*. During the Class Period, defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of Cal. Bus. & Prof. Code §16720. Defendants, and each of them, have acted in violation of Cal. Bus. & Prof. Code §16720 to fix, raise, stabilize, and maintain prices of generic digoxin and/or generic doxycycline at supracompetitive levels. The violations of Cal. Bus. & Prof. Code §16720 consisted, without limitation, of a continuing unlawful trust and concert of action among defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain, and stabilize the prices of generic digoxin and/or generic doxycycline. For the purpose of forming and effectuating the unlawful trust, defendants and their co-conspirators have done those things which they combined and conspired to do, including, but not limited to, the acts, practices and course of conduct set forth above, and creating a price floor, fixing, raising, and stabilizing the price of generic digoxin and/or generic doxycycline. The combination and conspiracy alleged herein has had, *inter alia*, the following effects: (1) price competition for generic digoxin

and/or generic doxycycline has been restrained, suppressed and/or eliminated in the State of California; (2) prices for generic digoxin and/or generic doxycycline provided by defendants and their co-conspirators have been fixed, raised, stabilized, and pegged at artificially high, non-competitive levels in the State of California and throughout the United States; and (3) those who purchased generic digoxin and/or generic doxycycline directly or indirectly from defendants and their co-conspirators have been deprived of the benefit of free and open competition. As a direct and proximate result of defendants' unlawful conduct, plaintiff and members of the Damages Class have been injured in their business and property in that they paid more for generic digoxin and/or generic doxycycline than they otherwise would have paid in the absence of defendants' unlawful conduct. As a result of defendants' violation of Cal. Bus. & Prof. Code §16720, plaintiff and members of the Damages Class seek treble damages and their cost of suit, including a reasonable attorneys' fee, pursuant to Cal. Bus. & Prof. Code §16750(a).

149.    Defendants have entered into an unlawful agreement in restraint of trade in violation of D.C. Code §28-4501 *et seq.* Defendants' combinations or conspiracies had the following effects: (1) generic digoxin and/or generic doxycycline price competition was restrained, suppressed and eliminated throughout the District of Columbia; (2) generic digoxin and generic doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout the District of Columbia; (3) plaintiff and members of the Damages Class, including those who resided in the District of Columbia and/or purchased generic digoxin and/or generic doxycycline that were shipped by defendants or their coconspirators, were deprived of free and open competition, including in the District of Columbia; and (4) plaintiff and members of the Damages Class, including those who resided in the District of Columbia and purchased generic digoxin and/or generic doxycycline in the District of Columbia that were shipped by defendants or their co-conspirators, paid supracompetitive, artificially inflated prices for generic digoxin and/or generic doxycycline, including in the District of Columbia. During the Class Period, defendants' illegal conduct substantially affected commerce in the District of Columbia. As a direct and proximate result of defendants' unlawful conduct, plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing,

defendants have entered into agreements in restraint of trade in violation of D.C. Code §28-4501 *et seq*. Accordingly, plaintiff and members of the Damages Class seek all forms of relief available under D.C. Code §28-4501 *et seq*.

150. Defendants have entered into an unlawful agreement in restraint of trade in violation of Haw. Rev. Stat. §480-1 *et seq*. Defendants' unlawful conduct had the following effects: (1) generic digoxin and/or generic doxycycline price competition was restrained, suppressed and eliminated throughout Hawaii; (2) generic digoxin and/or generic doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout Hawaii; (3) plaintiff and members of the Damages Class were deprived of free and open competition; and (4) plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic digoxin and/or generic doxycycline. During the Class Period, defendants' illegal conduct substantially affected Hawaii commerce. As a direct and proximate result of defendants' unlawful conduct, plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Haw. Rev. Stat. §480-1 *et seq*. Accordingly, plaintiff and members of the Damages Class seek all forms of relief available under Haw. Rev. Stat. §480-4.

151. Defendants have entered into an unlawful agreement in restraint of trade in violation of Iowa Code §553.1 *et seq*. Defendants' combinations or conspiracies had the following effects: (1) generic digoxin and/or generic doxycycline price competition was restrained, suppressed and eliminated throughout Iowa; (2) generic digoxin and/or generic doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout Iowa; (3) plaintiff and members of the Damages Class were deprived of free and open competition; and (4) plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic digoxin and/or generic doxycycline. During the Class Period, defendants' illegal conduct substantially affected Iowa commerce. As a direct and proximate result of defendants' unlawful conduct, plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, defendants have entered into agreements in restraint

of trade in violation of Iowa Code §553.1 *et seq*.  Accordingly, plaintiff and members of the Damages Class seek all forms of relief available under Iowa Code §553.1 *et seq*.

152.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Kan. Stat. §50-101 *et seq*.  Defendants' combinations or conspiracies had the following effects: (1) generic digoxin and/or generic doxycycline price competition was restrained, suppressed and eliminated throughout Kansas; (2) generic digoxin and/or generic doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout Kansas; (3) plaintiff and members of the Damages Class were deprived of free and open competition; and (4) plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic digoxin and/or generic doxycycline.  During the Class Period, defendants' illegal conduct substantially affected Kansas commerce.  As a direct and proximate result of defendants' unlawful conduct, plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury.  By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Kan. Stat. §50-101 *et seq*.  Accordingly, plaintiff and members of the Damages Class seek all forms of relief available under Kan. Stat. §50-101 *et seq*.

153.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Mich. Comp. Laws §445.771 *et seq*.  Defendants' combinations or conspiracies had the following effects: (1) generic digoxin and/or generic doxycycline price competition was restrained, suppressed and eliminated throughout Michigan; (2) generic digoxin and/or generic doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout Michigan; (3) plaintiff and members of the Damages Class were deprived of free and open competition; and (4) plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic digoxin and/or generic doxycycline.  During the Class Period, defendants' illegal conduct substantially affected Michigan commerce.  As a direct and proximate result of defendants' unlawful conduct, plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury.  By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Mich. Comp. Laws §445.771 *et seq*.

Accordingly, plaintiff and members of the Damages Class seek all relief available under Mich. Comp. Laws §445.771 *et seq.*

154.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Minn. Stat. §325D.49 *et seq.*  Defendants' combinations or conspiracies had the following effects: (1) generic digoxin and/or generic doxycycline price competition was restrained, suppressed and eliminated throughout Minnesota; (2) generic digoxin and/or generic doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout Minnesota; (3) plaintiff and members of the Damages Class were deprived of free and open competition; and (4) plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic digoxin and/or generic doxycycline.  During the Class Period, defendants' illegal conduct substantially affected Minnesota commerce.  As a direct and proximate result of defendants' unlawful conduct, plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury.  By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Minn. Stat. §325D.49 *et seq.*  Accordingly, plaintiff and members of the Damages Class seek all relief available under Minn. Stat. §325D.49 *et seq.*

155.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Miss. Code §75-21-1 *et seq.*  Defendants' combinations or conspiracies had the following effects: (1) generic digoxin and/or generic doxycycline price competition was restrained, suppressed and eliminated throughout Mississippi; (2) generic digoxin and/or generic doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout Mississippi; (3) plaintiff and members of the Damages Class were deprived of free and open competition; and (4) plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic digoxin and/or generic doxycycline.  During the Class Period, defendants' illegal conduct substantially affected Mississippi commerce.  As a direct and proximate result of defendants' unlawful conduct, plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury.  By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Miss. Code §75-21-1 *et seq.*

Accordingly, plaintiff and members of the Damages Class seek all relief available under Miss. Code §75-21-1 *et seq.*

156. Defendants have entered into an unlawful agreement in restraint of trade in violation of Neb. Rev. Stat. §59-801 *et seq.* Defendants' combinations or conspiracies had the following effects: (1) generic digoxin and/or generic doxycycline price competition was restrained, suppressed and eliminated throughout Nebraska; (2) generic digoxin and/or generic doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nebraska; (3) plaintiff and members of the Damages Class were deprived of free and open competition; and (4) plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic digoxin and/or generic doxycycline. During the Class Period, defendants' illegal conduct substantially affected Nebraska commerce. As a direct and proximate result of defendants' unlawful conduct, plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Neb. Rev. Stat. §59-801 *et seq.* Accordingly, plaintiff and members of the Damages Class seek all relief available under Neb. Rev. Stat. §59-801 *et seq.*

157. Defendants have entered into an unlawful agreement in restraint of trade in violation of Nev. Rev. Stat. Ann. §598A.010 *et seq.* Defendants' combinations or conspiracies had the following effects: (1) generic digoxin and/or generic doxycycline price competition was restrained, suppressed and eliminated throughout Nevada; (2) generic digoxin and/or generic doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nevada; (3) plaintiff and members of the Damages Class were deprived of free and open competition; and (4) plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic digoxin and/or generic doxycycline. During the Class Period, defendants' illegal conduct substantially affected Nevada commerce. As a direct and proximate result of defendants' unlawful conduct, plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Nev. Rev. Stat. Ann. §598A.010 *et seq.*

Accordingly, plaintiff and members of the Damages Class seek all relief available under Nev. Rev. Stat. Ann. §598A.010 *et seq*.

158.    Defendants have entered into an unlawful agreement in restraint of trade in violation of N.D. Cent. Code §51-08.1-01 *et seq*.  Defendants' combinations or conspiracies had the following effects: (1) generic digoxin and/or generic doxycycline price competition was restrained, suppressed and eliminated throughout North Dakota; (2) generic digoxin and/or generic doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Dakota; (3) plaintiff and members of the Damages Class were deprived of free and open competition; and (4) plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic digoxin and/or generic doxycycline.  During the Class Period, defendants' illegal conduct had a substantial effect on North Dakota commerce.  As a direct and proximate result of defendants' unlawful conduct, plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury.  By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of N.D. Cent. Code §51-08.1-01 *et seq*. Accordingly, plaintiff and members of the Damages Class seek all relief available under N.D. Cent. Code §51-08.1-01 *et seq*.

159.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Or. Rev. Stat. §646.705 *et seq*.  Defendants' combinations or conspiracies had the following effects: (1) generic digoxin and/or generic doxycycline price competition was restrained, suppressed and eliminated throughout Oregon; (2) generic digoxin and/or generic doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout Oregon; (3) plaintiff and members of the Damages Class were deprived of free and open competition; and (4) plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic digoxin and/or generic doxycycline.  During the Class Period, defendants' illegal conduct had a substantial effect on Oregon commerce.  As a direct and proximate result of defendants' unlawful conduct, plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury.  By reason of the foregoing, defendants have entered into agreements

in restraint of trade in violation of Or. Rev. Stat. §646.705 *et seq.* Accordingly, plaintiff and members of the Damages Class seek all relief available under Or. Rev. Stat. §646.705 *et seq.*

160. Defendants have entered into an unlawful agreement in restraint of trade in violation of Tenn. Code Ann. §47-25-101 *et seq.* Defendants' combinations or conspiracies had the following effects: (1) generic digoxin and/or generic doxycycline price competition was restrained, suppressed and eliminated throughout Tennessee; (2) generic digoxin and/or generic doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout Tennessee; (3) plaintiff and members of the Damages Class were deprived of free and open competition; and (4) plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic digoxin and/or generic doxycycline. During the Class Period, defendants' illegal conduct had a substantial effect on Tennessee commerce. As a direct and proximate result of defendants' unlawful conduct, plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Tenn. Code Ann. §47-25-101 *et seq.* Accordingly, plaintiff and members of the Damages Class seek all relief available under Tenn. Code Ann. §47-25-101 *et seq.*

161. Defendants have entered into an unlawful agreement in restraint of trade in violation of Wis. Stat. §133.01 *et seq.* Defendants' combinations or conspiracies had the following effects: (1) generic digoxin and/or generic doxycycline price competition was restrained, suppressed and eliminated throughout Wisconsin; (2) generic digoxin and/or generic doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout Wisconsin; (3) plaintiff and members of the Damages Class were deprived of free and open competition; and (4) plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic digoxin and/or generic doxycycline. During the Class Period, defendants' illegal conduct had a substantial effect on Wisconsin commerce. As a direct and proximate result of defendants' unlawful conduct, plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, defendants have entered into agreements

in restraint of trade in violation of Wis. Stat. §133.01 *et seq*. Accordingly, plaintiff and members of the Damages Class seek all relief available under Wis. Stat. §133.01 *et seq*.

162. Plaintiff and members of the Damages Class in each of the above states have been injured in their business and property by reason of defendants' unlawful combination, contract, conspiracy and agreement. Plaintiff and members of the Damages Class have paid more for generic digoxin and/or generic doxycycline than they otherwise would have paid in the absence of defendants' unlawful conduct. This injury is of the type the antitrust laws of the above states were designed to prevent and flows from that which makes defendants' conduct unlawful.

163. In addition, defendants have profited significantly from the conspiracy. Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of plaintiff and the members of the Damages Class.

164. Accordingly, plaintiff and the members of the Damages Class in each of the above jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

## COUNT IV

### Violation of State Consumer Protection Statutes
### on Behalf of Plaintiff and the Damages Class

165. Plaintiff repeats the allegations set forth above as if fully set forth herein.

166. Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

167. Defendants have knowingly entered into an unlawful agreement in restraint of trade in violation of Ark. Code Ann. §4-88-101 *et seq*. Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which generic digoxin and/or generic doxycycline were sold, distributed, or obtained in Arkansas and took efforts to conceal their agreements from plaintiff and members of the Damages Class. The aforementioned conduct on the part of the defendants constituted "unconscionable" and "deceptive" acts or practices in violation of

Ark. Code Ann. §4-88-107(a)(10). Defendants' unlawful conduct had the following effects: (1) generic digoxin and/or generic doxycycline price competition was restrained, suppressed and eliminated throughout Arkansas; (2) generic digoxin and/or generic doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout Arkansas; (3) plaintiff and the members of the Damages Class were deprived of free and open competition; and (4) plaintiff and the members of the Damages Class paid supracompetitive, artificially inflated prices for generic digoxin and/or generic doxycycline. During the Class Period, defendants' illegal conduct substantially affected Arkansas commerce and consumers. As a direct and proximate result of defendants' unlawful conduct, plaintiff and the members of the Damages Class have been injured in their business and property and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ark. Code Ann. §4-88-107(a)(10) and, accordingly, plaintiff and the members of the Damages Class seek all relief available under that statute.

168.     Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of Cal. Bus. & Prof. Code §17200 *et seq*. During the Class Period, defendants manufactured, marketed, sold, or distributed generic digoxin and/or generic doxycycline in California, and committed and continue to commit acts of unfair competition, as defined by Cal. Bus. & Prof. Code §17200 *et seq*., by engaging in the acts and practices specified above. This claim is instituted pursuant to Cal. Bus. & Prof. Code §§17203 and 17204, to obtain restitution from these defendants for acts, as alleged herein, that violated Cal. Bus. & Prof. Code §17200, commonly known as the Unfair Competition Law. Defendants' conduct as alleged herein violated Cal. Bus. & Prof. Code §17200. The acts, omissions, misrepresentations, practices and non-disclosures of defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of Cal. Bus. & Prof. Code §17200 *et seq*., including, but not limited to, the following: (1) the violations of §§1 and 3 of the Sherman Act, as set forth above; (2) the violations of Cal. Bus. & Prof. Code §16720 *et seq*., set forth above. Defendants' acts, omissions, misrepresentations, practices, and non-disclosures, as described above, whether or not in

violation of Cal. Bus. & Prof. Code §16720 *et seq.*, and whether or not concerted or independent acts, are otherwise unfair, unconscionable unlawful or fraudulent; (3) defendants' acts or practices are unfair to purchasers of generic digoxin and/or generic doxycycline in the State of California within the meaning of Cal. Bus. & Prof. Code §17200 *et. seq.*; and (4) defendants' acts and practices are fraudulent or deceptive within the meaning of Cal. Bus. & Prof. Code §17200 *et seq.*  Plaintiff and members of the Damages Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation and benefits that may have been obtained by defendants as a result of such business acts or practices.  The illegal conduct alleged herein is continuing and there is no indication that defendants will not continue such activity into the future.  The unlawful and unfair business practices of defendants, and each of them, as described above, have caused and continue to cause plaintiff and the members of the Damages Class to pay supracompetitive and artificially inflated prices for generic digoxin and/or generic doxycycline.  Plaintiff and the members of the Damages Class suffered injury in fact and lost money or property as a result of such unfair competition.  The conduct of defendants as alleged in this Complaint violates Cal. Bus. & Prof. Code §17200 *et seq.*  As alleged in this Complaint, defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by defendants' unfair competition.  Plaintiff and the members of the Damages Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation and benefits that may have been obtained by defendants as a result of such business practices, pursuant to Cal. Bus. & Prof. Code §§17203 and 17204.

169.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of D.C. Code §28-3901 *et seq.*  Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which generic digoxin and/or generic doxycycline were sold, distributed or obtained in the District of Columbia.  The foregoing conduct constitutes "unlawful trade practices," within the meaning of D.C. Code §28-3904.  Plaintiff was not aware of defendants' price-fixing conspiracy and was therefore unaware that it was being unfairly and illegally overcharged.  There was a gross disparity of bargaining power between the parties with

respect to the prices charged by defendants for generic digoxin and/or generic doxycycline. Defendants had the sole power to set the prices and plaintiff had no power to negotiate lower prices. Moreover, plaintiff lacked any meaningful choice in purchasing generic digoxin and/or generic doxycycline because it was unaware of the unlawful overcharge and there was no alternative source of supply through which plaintiff could avoid the overcharges. Defendants' conduct with regard to sales of generic digoxin and generic doxycycline, including their illegal conspiracy to secretly fix the prices of generic digoxin and/or generic doxycycline at supracompetitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited defendants at the expense of plaintiff and the members of the Damages Class. Defendants took grossly unfair advantage of plaintiff. The suppression of competition that has resulted from defendants' conspiracy has ultimately resulted in unconscionably higher prices for purchasers so that there was a gross disparity between the price paid and the value received for generic digoxin and/or generic doxycycline. Defendants' unlawful conduct had the following effects: (1) generic digoxin and/or generic doxycycline price competition was restrained, suppressed and eliminated throughout the District of Columbia; (2) generic digoxin and generic doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout the District of Columbia; (3) plaintiff and the Damages Class were deprived of free and open competition; and (4) plaintiff and the Damages Class paid supracompetitive, artificially inflated prices for generic digoxin and/or generic doxycycline. As a direct and proximate result of defendants' conduct, plaintiff and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of D.C. Code §28-3901 *et seq.*, and, accordingly, plaintiff and members of the Damages Class seek all relief available under that statute.

170. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §501.201 *et seq*. Defendants' unlawful conduct had the following effects: (1) generic digoxin and/or generic doxycycline price competition was restrained, suppressed and eliminated throughout Florida; (2) generic digoxin and/or generic doxycycline prices were raised, fixed, maintained and

stabilized at artificially high levels throughout Florida; (3) plaintiff and members of the Damages Class were deprived of free and open competition; and (4) plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic digoxin and/or generic doxycycline.  During the Class Period, defendants' illegal conduct substantially affected Florida commerce and consumers.  As a direct and proximate result of defendants' unlawful conduct, plaintiff and members of the Damages Class have been injured and are threatened with further injury.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Fla. Stat. §501.201 *et seq*., and, accordingly, plaintiff and members of the Damages Class seek all relief available under that statute.

171.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of Haw. Rev. Stat. §480-1 *et seq*.  Defendants' unlawful conduct had the following effects: (1) generic digoxin and/or generic doxycycline price competition was restrained, suppressed and eliminated throughout Hawaii; (2) generic digoxin and/or generic doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout Hawaii; (3) plaintiff and members of the Damages Class were deprived of free and open competition; and (4) plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic digoxin and/or generic doxycycline.  During the Class Period, defendants' illegal conduct substantially affected Hawaii commerce and consumers.  As a direct and proximate result of defendants' unlawful conduct, plaintiff and members of the Damages Class have been injured and are threatened with further injury.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Haw. Rev. Stat. §480-1 *et seq*., and, accordingly, plaintiff and members of the Damages Class seek all relief available under that statute.

172.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of Missouri's Merchandising Practices Act, Mo. Rev. Stat. §407.010 *et seq*.  Plaintiff and members of the Damages Class purchased generic digoxin and/or generic doxycycline for personal or family purposes.  Defendants engaged in the conduct described herein in connection with the sale of generic digoxin and/or generic doxycycline in trade or commerce in a market that includes Missouri.  Defendants agreed to, and did in fact affect, fix,

control and/or maintain, at artificial and non-competitive levels, the prices at which generic digoxin and/or generic doxycycline were sold, distributed or obtained in Missouri, which conduct constituted unfair practices in that it was unlawful under federal and state law, violated public policy, was unethical, oppressive and unscrupulous, and caused substantial injury to plaintiff and members of the Damages Class. Defendants concealed, suppressed, and omitted to disclose material facts to plaintiff and members of the Damages Class concerning defendants' unlawful activities and artificially inflated prices for generic digoxin and/or generic doxycycline. The concealed, suppressed, and omitted facts would have been important to plaintiff and members of the Damages Class as they related to the cost of generic digoxin and/or generic doxycycline they purchased. Defendants misrepresented the real cause of price increases and/or the absence of price reductions in generic digoxin and/or generic doxycycline by making public statements that were not in accord with the facts. Defendants' statements and conduct concerning the price of generic digoxin and/or generic doxycycline were deceptive as they had the tendency or capacity to mislead plaintiff and members of the Damages Class to believe that they were purchasing generic digoxin and/or generic doxycycline at prices established by a free and fair market. Defendants' unlawful conduct had the following effects: (1) generic digoxin and/or generic doxycycline price competition was restrained, suppressed and eliminated throughout Missouri; (2) generic digoxin and/or generic doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout Missouri; (3) plaintiff and members of the Damages Class were deprived of free and open competition; and (4) plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic digoxin and/or generic doxycycline. The foregoing acts and practices constituted unlawful practices in violation of Missouri's Merchandising Practices Act. As a direct and proximate result of the above-described unlawful practices, plaintiff and members of the Damages Class suffered ascertainable loss of money or property. Accordingly, plaintiff and members of the Damages Class seek all relief available under Missouri's Merchandising Practices Act, specifically Mo. Rev. Stat. §407.020, which prohibits "[t]he act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in

trade or commerce" as further interpreted by the Missouri Code of State Regulations, 15 CSR 60-7.010 *et seq*., 15 CSR 60-8.010 *et seq*., and 15 CSR 60-9.010 *et seq*., and Mo. Rev. Stat. §407.025, which provides for the relief sought in this Count.

173.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of N.C. Gen. Stat. §75-1.1 *et seq*.  Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which generic digoxin and/or generic doxycycline were sold, distributed or obtained in North Carolina and took efforts to conceal their agreements from plaintiff and members of the Damages Class.  Defendants' price-fixing conspiracy could not have succeeded absent deceptive conduct by defendants to cover up their illegal acts.  Secrecy was integral to the formation, implementation and maintenance of defendants' price-fixing conspiracy.  Defendants committed inherently deceptive and self-concealing actions, of which plaintiff could not possibly have been aware.  Defendants and their co-conspirators publicly provided pretextual and false justifications regarding their price increases.  Defendants' public statements concerning the price of generic digoxin and/or generic doxycycline created the illusion of competitive pricing controlled by market forces rather than supracompetitive pricing driven by defendants' illegal conspiracy.  Moreover, defendants deceptively concealed their unlawful activities by mutually agreeing not to divulge the existence of the conspiracy to outsiders.  The conduct of defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of North Carolina consumers in an honest marketplace in which economic activity is conducted in a competitive manner.  Defendants' unlawful conduct had the following effects: (1) generic digoxin and/or generic doxycycline price competition was restrained, suppressed and eliminated throughout North Carolina; (2) generic digoxin and/or generic doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Carolina; (3) plaintiff and members of the Damages Class were deprived of free and open competition; and (4) plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic digoxin and/or generic doxycycline.  During the Class Period, defendants

marketed, sold, or distributed generic digoxin and/or generic doxycycline in North Carolina, and defendants' illegal conduct substantially affected North Carolina commerce and consumers. During the Class Period, each of the defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed generic digoxin and/or generic doxycycline in North Carolina. Plaintiff and members of the Damages Class seek actual damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.C. Gen. Stat. §75-1.1 *et seq*., and, accordingly, plaintiff and members of the Damages Class seek all relief available under that statute.

174.     Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the South Carolina Unfair Trade Practices Act, S.C. Code Ann. §39-5-10 *et seq*. Defendants' combinations or conspiracies had the following effects: (1) generic digoxin and/or generic doxycycline price competition was restrained, suppressed and eliminated throughout South Carolina; (2) generic digoxin and/or generic doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout South Carolina; (3) plaintiff and members of the Damages Class were deprived of free and open competition; and (4) plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic digoxin and/or generic doxycycline. During the Class Period, defendants' illegal conduct had a substantial effect on South Carolina commerce. As a direct and proximate result of defendants' unlawful conduct, plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Ann. §39-5-10 *et seq*., and, accordingly, plaintiff and the members of the Damages Class seek all relief available under that statute.

### COUNT V

**Unjust Enrichment**
**on Behalf of Plaintiff and the Damages Class**

175.     Plaintiff repeats the allegations set forth above as if fully set forth herein.

176.     As a result of their unlawful conduct described above, defendants have and will continue to be unjustly enriched.  Defendants have been unjustly enriched by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits on generic digoxin and/or generic doxycycline.

177.     Defendants have benefited from their unlawful acts and it would be inequitable for defendants to be permitted to retain any of the benefits resulting from the overpayments made by plaintiff and the members of the Damages Class for generic digoxin and/or generic doxycycline manufactured by defendants during the Class Period.

178.     Plaintiff and the members of the Damages Class are entitled to the amount of defendants' ill-gotten gains resulting from their unlawful, unjust and inequitable conduct.  Plaintiff and the members of the Damages Class are entitled to the establishment of a constructive trust consisting of all ill-gotten gains from which plaintiff and the members of the Damages Class may make claims on a pro rata basis.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff requests that the Court enter judgment on its behalf and on behalf of the Class herein, adjudging and decreeing that:

A.     This action may proceed as a class action, with plaintiff as the designated Class representative and its counsel as Class Counsel;

B.     Defendants have engaged in a combination and conspiracy in violation of §1 of the Sherman Act, 15 U.S.C. §1, and §3 of the Sherman Act, 15 U.S.C. §3, and plaintiff and the members of the Class have been injured in their business and property as a result of defendants' violation;

C.     Plaintiff and the members of the Class are entitled to recover damages sustained by them, as provided by the state antitrust laws listed in Count III and the consumer protection laws listed in Count IV, an injunction under federal antitrust laws and that a joint and several judgment in favor of plaintiff and the Class be entered against defendants in an amount to be trebled in accordance with such laws;

D.     Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents, and employees thereof and all other persons acting or

- 49 -

claiming to act on their behalf be permanently enjoined and restrained from continuing and maintaining the combination, conspiracy or agreement alleged herein;

E.  Plaintiff and members of the Class be awarded pre-judgment and post-judgment interest, and that such interest be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

F.  Plaintiff and members of the Class recover their costs of this suit, including reasonable attorneys' fees as provided by law; and

G.  Plaintiff and members of the Class receive such other or further relief as may be just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury of all issues triable by jury.

DATED:  March 25, 2016

LAW OFFICES OF MARC S. HENZEL
MARC S. HENZEL (MSH 2062)

_____

MARC S. HENZEL

230 Old Lancaster Road, Suite B
Merion Station, PA  19066
Telephone:  610/660-8000
610/660-8080 (fax)
mhenzel@henzellaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
DAVID W. MITCHELL
BRIAN O. O'MARA
ALEXANDRA S. BERNAY
CARMEN A. MEDICI
ARTHUR L. SHINGLER III
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)
davidm@rgrdlaw.com
bomara@rgrdlaw.com
xanb@rgrdlaw.com
ashingler@rgrdlaw.com

CAVANAGH & O'HARA
PATRICK J. O'HARA
2319 West Jefferson Street
Springfield, IL  62702
Telephone:  217/544-1771
217/544-9894 (fax)

Attorneys for Plaintiff

I:\Admin\CptDraft\Antitrust\CPT Digoxin.docx